**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHARLES HERBERT PROCTOR, III and SYNOVA ASSET MANAGEMENT, LLC, on behalf of themselves and all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JP MORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES LLC, J.P. MORGAN FUTURES, INC. (now known as J.P. MORGAN SECURITIES LLC), and JOHN DOES 1-50, | |
| Defendants. | |

## TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE .............................................................................................3

THE PARTIES ..........................................................................................................................4

    I.        Plaintiffs ....................................................................................................................4

    II.      Defendants ...............................................................................................................5

           A.       J.P. Morgan Securities LLC ....................................................................5

           B.       J.P. Morgan Chase & Co. .........................................................................5

           C.       J.P. Morgan Clearing Corp. ....................................................................5

           D.       J.P. Morgan Futures, Inc. ........................................................................5

           E.       John Doe Defendants ...............................................................................6

FACTUAL ALLEGATIONS .....................................................................................................6

    I.        Relevant Factual Background ..............................................................................6

           A.       Overview of Key Terms ...........................................................................6

           B.       The CME Group .......................................................................................8

           C.       Overview of Treasury Futures ...............................................................11

           D.       The Mechanics of Spoofing ..................................................................13

    II.      Evidence of Defendants' Misconduct ..............................................................17

           A.       J.P. Morgan is an Active Participant in the Treasury Futures Market .........................17

           B.       Defendants' Manipulation of Treasury Futures ................................19

           C.       Defendants Manipulated and Spoofed Other Commodity and Commodity Futures Markets ...............................................20

CLASS ACTION ALLEGATIONS .......................................................................................24

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ............................27

FIRST CLAIM FOR RELIEF ..............................................................................................28

SECOND CLAIM FOR RELIEF .........................................................................................29

THIRD CLAIM FOR RELIEF ..............................................................................................30

FOURTH CLAIM FOR RELIEF ...........................................................................................31

PRAYER FOR RELIEF ..........................................................................................................31

DEMAND FOR JURY TRIAL ...............................................................................................32

Plaintiffs Charles Herbert Proctor, III, and Synova Asset Management, LLC (collectively, "Plaintiffs"), individually and on behalf of themselves and all those similarly situated, as defined below, bring this class action for damages and allege as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' unlawful and intentional manipulation of U.S. Treasury futures contracts and options on those contracts ("Treasury Futures") that trade on United States-based exchanges, including but not limited to the Chicago Mercantile Exchange ("CME"), including its subsidiary the Chicago Board of Trade ("CBOT"), during the period at least January 1, 2009 through present (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), and the common law.

2.      Treasury Futures are derivatives of Treasury instruments, debt securities issued by the United States government that earn interest (known as coupon payments) through maturity when the "par" amount (equal to the principal) is returned to the owner.

3.      Defendants manipulated the prices of Treasury Futures by employing a classic manipulative device known as "spoofing," whereby Defendants placed orders for Treasury Futures to send false and illegitimate supply and demand signals to an otherwise efficient market and then canceled those orders before execution.  As a result, Defendants caused Treasury Futures prices to be artificial throughout the Class Period to financially benefit their trading positions at the expense of other investors, like Plaintiffs and the Class.

4.      Defendants repeated the scheme throughout the Class Period and successfully manipulated the Treasury Futures market to artificial levels throughout the Class Period.

5.      The unlawful conduct and manipulation described herein is the subject of an only-recently disclosed criminal and regulatory investigation.  Defendants filed their annual report Form 10-K with the Securities Exchange Commission dated February 25, 2020 providing a comprehensive

overview of the company for 2019. In the 10-K, Defendants admitted that "[v]arious authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries."[1]

6.      This is not the first time Defendants have used spoofing to manipulate futures prices. The regulatory investigation into Defendants' trading practices in the Treasury Futures market comes on the heels of other ongoing regulatory investigations including spoofing the precious metals futures markets. Beginning in 2018, the U.S. Department of Justice ("DOJ") criminally charged several of Defendants' employees, including Michael Nowak, head of the precious metals trading desk, for their roles in manipulating the prices of precious metals futures contracts. Two employees, John Edmonds and Christian Trunz, have since pled guilty and are cooperating with the ongoing federal criminal investigation.[2] Similarly, the Commodity Futures Trading Commission ("CFTC") has imposed civil penalties and sanctions against several of those same individuals.

7.      Plaintiffs' allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel. That investigation included reviewing and analyzing information concerning the Treasury market, which Plaintiffs (through their counsel) obtained from, among other sources: (1) reports about the Treasury market;

---

[1] JPMorgan Chase & Co. 2019 Form 10-K, 280-281, (Feb. 25, 2020) *available at*: https://jpmorganchaseco.gcs-web.com/node/315401/html (last accessed Apr. 29, 2020).

[2] *See United States v. Edmonds*, No. 3:18-cr-00239-RNC-1 (D. Conn. 2019); Order Instituting Proceedings Against John Edmonds Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, CFTC Docket No. 19-26, July 25, 2019; *United States v. Trunz*, No. 1:19-cr-00375 (E.D.N.Y. 2019); Order Instituting Proceedings Against Christian Trunz Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, CFTC Docket No. 19-26, September 16, 2019.

(2) publicly available press releases, news articles, and other media reports related to investigations into manipulation of Treasury Futures, among others; (3) documents concerning Defendants' business practices made available through private civil litigation as well as formal investigations and enforcement proceedings, including by the DOJ and CFTC; and (4) Defendants' U.S. Securities and Exchange Commission ("SEC") filings and other public reports about Defendants.

8.    Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 22 of the CEA, 7 U.S.C. § 25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

10.    Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c).  One or more of the Defendants resided, transacted business, were found, or had agents in the District.  Indeed, Chicago, Illinois is the global center of futures and options trading, a major hub of the Treasury trading activity at issue in this litigation, and the location of key witnesses and documents.  In particular, the Northern District of Illinois is home to the Chicago Board of Trade and CME Group. Inc., which host the Treasury futures and options trading at issue in this litigation.  For example, CME, the exchange through which the alleged manipulation occurred, is in Chicago, Illinois, and the electronic trading system, through which the trades at issue were made, utilizes servers located in Chicago, Illinois.  As such, a significant part of the events giving rise to the claims occurred in the Northern District of Illinois.

11.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged in this Complaint.  Treasury Futures are commodities that trade in interstate commerce in the United States.

## THE PARTIES

### I.   Plaintiffs

12.     Plaintiff Charles Herbert Proctor, III ("Proctor") was at all relevant times a Michigan resident and transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT.  Plaintiff Proctor transacted in Treasury Futures contracts and options on those contracts during the Class Period and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Proctor and the Class of the ability to transact in a lawful market that was free of manipulation.

13.     Plaintiff Synova Asset Management, LLC ("Synova") was at all relevant times an Arizona limited liability company. Plaintiff Synova transacted in Treasury Futures during the Class Period, including purchases and sales of futures contracts on the CBOT.  Plaintiff Synova transacted in Treasury Futures contracts and options on those contracts during the Class Period and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Synova and the Class of the ability to transact in a lawful market that was free of manipulation.

II.     **Defendants**

    A.     **J.P. Morgan Securities LLC**

14.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a Delaware company and its principal place of business is located at 277 Park Avenue, New York, New York 10172.  JPMorgan operates as a subsidiary of J.P. Morgan Chase & Co.  During the Class Period, JPMorgan, including its predecessors, served as a primary dealer of U.S. Treasury securities and transacted in U.S. Treasury-based instruments, including Treasury Futures.

    B.     **J.P. Morgan Chase & Co.**

15.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a Delaware corporation headquartered at 270 Park Avenue, New York, New York 10005.  JPMC is a multinational banking and financial services corporation.

    C.     **J.P. Morgan Clearing Corp.**

16.     Defendant J.P. Morgan Clearing Corp. is a Delaware corporation headquartered at 4 Chase Metrotech Center, Brooklyn, New York 11245.  J.P. Morgan Clearing Corp. offers securities and futures clearing, settlement, lending, and related services to traders, hedge fund managers, broker-dealers, and investment advisors.  It also provides operational and administrative services for registered broker-dealers.

    D.     **J.P. Morgan Futures, Inc.**

17.     Defendant J.P. Morgan Futures, Inc. (now known as and merged into J.P. Morgan Securities LLC) was a Delaware corporation headquartered in New York, New York until June 1, 2011, when it was acquired by J.P. Morgan Securities LLC.  Collectively, the individual J.P. Morgan Defendants are referred to as "J.P. Morgan."

5

### E. John Doe Defendants

18.     Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Treasury Futures. The defined term "Defendants" also includes John Doe Defendants.

19.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Treasury Futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

20.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

21.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

### I.  Relevant Factual Background

### A.  Overview of Key Terms

22.     **Commodity Futures Contract.** A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based. The commodity underlying a futures contract can

6

be a physical commodity, *e.g.* corn or silver, or a financial instrument, *e.g.* Treasury bills, foreign currencies, or the value of a stock index. Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

23. **"Long" and "Short" Futures.** Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future. Treasury Futures are deliverable upon expiry. However, futures contracts can also be offset before expiration.

24. **Offset by Trading.** Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs. For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

25. **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Treasury Futures).

26. **Call option.** A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that

7

the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

27.    **Put options.**  A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay below the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

### B.    The CME Group

28.    The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges. Its Global Headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606. In 2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a DCM offering products subject to CBOT rules and regulations. CBOT brought a suite of interest rates, agricultural, and equity index products to CME Group's existing offering. Today, the CME Group is made up of four exchanges, CME, CBOT, NYMEX, and COMEX. Each exchange offers a wide range of global benchmarks across major asset classes.

29.    The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts. Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day. CME Globex is also subject to CME rules including those that (a) govern the conduct of CME Globex users

and (b) provide for disciplinary sanctions including but not limited to exclusion from trading. The platform is based in and utilizes computer servers in Chicago and Aurora, Illinois.

30.     CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels." An "order" is a request to buy (a "bid") or sell (an "offer" or "ask"). The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level. The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

31.     Quotes to buy or sell are entered into the Order Book, which allows market participants to see the number of orders and the total number of contracts that all traders are actively bidding or offering at a given price level. The identities of traders who submit quotes into the Order Book are anonymous. Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

32.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels. This combined bid and ask information is often referred to as the visible order book and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1). Traders use the information contained in the order book to make trading decisions.



FIGURE 1.

33.    An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact.  Practically speaking, an aggressive buy order would be placed at the first- offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower.   Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

34.    By contrast, a "passive order" does not give up the spread in price.  On the buy side of the market, a passive buy order is placed at the best-price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell.  A passive sell order would be placed at the best-bid offer price or higher.  Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

10

35.     CME Globex bids and offers for outright futures are matched according to an algorithm known as "FIFO," which stands for first-in, first-out.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size. Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue. Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity.  The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed. In addition, futures contract spreads are matched based on an algorithm that takes into account the size of the orders among other criteria, with orders filled on a pro rata basis depending upon, among other things the size of the order, and with larger orders receiving a larger pro rata share, all else being equal.

C.     **Overview of Treasury Futures**

36.     **U.S. Treasury Securities.**  To raise capital to operate the federal government and finance the public debt, the U.S. Treasury sells marketable securities in the form of bills, notes, and bonds to institutional and individual investors through investment companies and banks at public auctions.  This debt is subject to fixed terms, e.g. 2-year, 5-year, 10-year, and 30-year terms at fixed interest rates determined by the prevailing interest rates in the marketplace at the time of issuance of the bonds.  Strictly speaking, U.S. Treasury bonds have original maturities of greater than 10 years at time of issuance, and U.S. Treasury notes ("T-Notes") have maturities ranging from 2-years to 10-years (2, 3, 5, 7 and 10 years).  Treasury bills, notes, and bonds are referred to as marketable securities because after they are sold in auctions, they are generally bought and sold in the secondary market at prevailing prices from dealers in government securities.  Many instruments bought and sold by market participants are linked to Treasury yields/prices.

37.     **Treasury Futures.** Treasury Futures are deliverable baskets of U.S. treasuries, fixed-income securities issued and backed by the U.S. government to finance debt.[3] Treasury Futures provide market participants with the ability to manage their interest rate exposure. Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future. Treasury Futures provide easy access to leverage and both capital and operational efficiencies, which benefit market participants – such as asset managers, banks, corporate treasurers, hedge funds, insurance companies, mortgage bankers, pension funds, primary dealers, and proprietary traders – for purposes of hedging and assuming risk exposures. In addition, Treasury Futures offer market participants the added security of reduced counterparty risk, insofar as CME faces every trade as its counterparty.

38.     Since the first Treasury Futures products were launched over 40 years ago, CBOT Treasury Futures have become one of the CME's core interest rate products. Presently, Treasury Futures primarily trade through CME Globex, though certain option contracts remain traded through open outcry. U.S. Treasury futures currently traded on the CME include: (i) 2-year T-Note Futures; (iii) 5-year T-Note Futures; (iii) 10-year T-Note Futures; (iv) U.S. Treasury Bond futures (v) Ultra 10-year T-Note Futures; and (vi) Ultra US Treasury Bond Futures. Options are available on U.S. Treasury Futures contracts. Treasury Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract. According to the CME, in February 2020, the average daily volume was 4.4 million Treasury Futures contracts and nearly 1 million Treasury Options contracts.

---

[3] As set forth above, references to Treasury Futures are to CBOT Treasury Futures and Options contracts, unless otherwise noted.

### D.   The Mechanics of Spoofing

39.   The Treasuries Futures market, like other futures markets, is susceptible to spoofing. "Spoofing" is a manipulative trading device used to create artificial prices in futures markets. Specially, the practice entails: (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity; (b) submitting or cancelling bids or offers to delay another person's execution of trades; (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth; or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[4]

40.   Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices. For example, if a trader wants to spoof prices lower, he will place an order (this could also be called a "Primary Order"), often in the form of an iceberg order, to buy futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell. The trader will then place one or more large orders—orders the trader never intends to execute—to *sell* a substantial amount of the same contract on the opposite side of the market. These orders are called the "spoof orders." Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled. These large orders falsely signal that investors are selling their futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order. The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

---

[4] CFTC, Antidisruptive Practices Authority, Interpretive Guidance and Policy Statement, 78 Fed. Reg. 31890, 31896 (May 28, 2013).

41.    FIGURES 2a and 2b below show the order book imbalance that spoofing causes. FIGURE 2a is a hypothetical order book.  The best bid is two ticks away from the best offer and, therefore, no executable trades are present.  For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid.  FIGURE 2b shows that same hypothetical order book after a series of orders have been entered, namely an iceberg buy order is placed to buy 200 contracts, but only showing 12 contracts to the market at a time.  Then, spoof orders are placed on the opposite side of the market:  one order, placed with an order splitter, for 200 contracts is placed at the first offer level; an additional order for 100 contracts is also placed at the first offer level; and a third order for 250 contracts is placed, using an order splitter, at the second offer level.  Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| | | | | |
| 105.5 | | | 15 | 187 |
| 104.5 | | | 8 | 94 |
| 104 | | | 12 | 144 |
| 103.5 | | | 14 | 269 |
| 103 | | | 6 | 87 |
| 102.5 | | | 11 | 124 |
| 101.5 | | | 10 | 356 |
| 101 | | | 11 | 243 |
| 100.5 | | | 19 | 312 |
| 100 | | | 15 | 428 |
| | | | | |
| 99 | 16 | 345 | | |
| 98.5 | 19 | 253 | | |
| 98 | 9 | 264 | | |
| 97.5 | 13 | 192 | | |
| 97 | 12 | 350 | | |
| 96.5 | 8 | 241 | | |
| 95.5 | 6 | 165 | | |
| 95 | 9 | 110 | | |
| 94 | 12 | 212 | | |
| 94.5 | 15 | 132 | | |
| **TOTAL**: | 119 | 2264 | 121 | 2244 |

Order Book Before the Spoofing Begins

FIGURE 2a.

15



FIGURE 2b.

42.     The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

43.     In each instance, the trader profits because spoofing allows the trader to buy futures contracts at below the current market price or to sell futures contracts at above the current market price. The CFTC has described spoofing as "a particularly pernicious example of bad actors seeking

16

to manipulate the market through the abuse of technology."[5]  James McDonald, CFTC's Director of

Enforcement, has remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[6]

44.     Traders engaged in spoofing gain an unfair and unlawful advantage over other market

participants, hindering competition, undermining market integrity, and harming law-abiding victims.

And, as alleged here, Defendants' use of spoofing harmed Plaintiffs and the Class members who

purchased or sold Treasury Futures at artificial prices during the Class Period.

## II.    Evidence of Defendants' Misconduct

### A.      J.P. Morgan is an Active Participant in the Treasury Futures Market

45.     J.P. Morgan's futures commission merchant ("FCM") division, Defendant J.P. Morgan

Securities LLC, ranks among the world's largest FCMs.[7]  In fact, the bank touts the fact that its FCM

division is "one of the most highly capitalized market leaders in the futures and options brokerage

business" and "has been at the forefront of many of the practices and services that have become

standard in the futures and options industry."[8]  J.P. Morgan clears on more than 70 exchanges and

---

[5] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (January 29, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[6] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (Nov. 14, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[7] Based on CFTC data, J.P. Morgan ranked as the second largest FCM as of December 31, 2018.  *See* "2019 Top FCMs", ManagedFuturesInvesting.com (Feb. 19, 2019), *available at*: https://www.managedfuturesinvesting.com/2019-top-fcms/ (last accessed Apr. 29, 2020).

[8] *See* "Futures & Options and OTC Clearing," J.P. Morgan Markets, *available at*: https://www.jpmorgan.com/jpmpdf/1320613563458.pdf (last accessed Apr. 29, 2020).

conducts electronic trading on more than 50 exchanges.[9] J.P. Morgan provides trade execution and clearing services to a variety of customers who transact in exchange-traded futures and options on futures contracts.[10]

46.    J.P. Morgan actively trades interest rate futures contracts, including, but not limited to, Treasury Futures. For example, as of December 31, 2017, J.P. Morgan had approximately $4.9 billion of notional value in exchange-traded interest rate futures contracts outstanding. Treasury Futures were among the interest rate futures contracts included in this figure.

47.    During the Class Period, trading of Treasury instruments, including Treasury Futures, were an integral part of J.P. Morgan's fixed income franchise. In a sign of the bank's commitment to its Treasury trading operations, during the Class Period, J.P. Morgan partnered with the high-frequency trading firm Virtu Financial Inc. to improve the efficiency of Treasury trading operations.[11] More generally, J.P. Morgan highlighted its expertise in developing sophisticated electronic trading strategies involving futures products, including global algorithmic trading products.[12] J.P. Morgan's

---

[9] *Id.*

[10] *See* "Commodity Futures Trading Commission Rule 1.55(K) And 1.55(O): Fcm-Specific Disclosure Document" for J.P. Morgan Securities LLC, *available at*: https://www.jpmorgan.com/jpmpdf/1320748305451.pdf (last accessed Apr. 29, 2020) (listing customer categories including, Institutional (asset managers, pension funds, insurance companies, banks, hedge funds); Private Bank (individuals); Commercial (corporates, agricultural, energy); Proprietary (HFT, family offices)).

[11] *See* Bradley Hope, "High-Frequency Trading Firm Virtu Partners With J.P. Morgan Chase," *Wall Street Journal* (Aug. 3, 2016), *available at*: https://www.wsj.com/articles/high-frequency-trading-firm-virtu-partners-with-j-p-morgan-chase-1470237145 (last accessed Apr. 29, 2020). Notably, Virtu Financial was previously targeted by the SEC in connection with a probe into allegations of spoofing by HFTs. *See* John McCrank, "Exclusive: SEC targets 10 firms in high frequency trading probe - SEC document", *Reuters* (July 17, 2014), *available at*: https://www.reuters.com/article/us-sec-investigation-highfrequencytradin/exclusive-sec-targets-10-firms-in-high-frequency-trading-probe-sec-document-idUSKBN 0FM2TW20140717 (last accessed Apr. 29, 2020).

[12] *See* "Futures & Options and OTC Clearing," J.P. Morgan Markets, *available at*: https://www.jpmorgan.com/jpmpdf/1320613563458.pdf (last accessed Apr. 29, 2020).

utilization and understanding of advanced electronic strategies underpin the factual allegations that give rise to this action.

**B.      Defendants' Manipulation of Treasury Futures**

48.      Throughout the Class Period, Defendants spoofed the Treasury Futures market to illegally increase their trading profits, at the expense of Plaintiffs and the Class.  By submitting and then withdrawing Deceptive Orders, Defendants were able to manipulate the Treasury Futures markets.

49.      Market participants traded in what appeared to be a legitimate change in supply or demand.  Thus, Defendants' Deceptive Orders caused market participants to enter sell orders below, or buy orders above, the prevailing market price as a result of the manipulation.  Likewise, other market participants kept positions below or above what would otherwise have been the prevailing market price and quantity.

50.      After entering the Deceptive Orders Defendants then cancelled the Deceptive Orders. Simultaneously or soon thereafter, Defendants entered orders on the same instrument on the opposite side of the Deceptive Order.  This allowed Defendants to buy or sell Treasury instruments from/to other market participants at artificially higher or lower prices than would have existed if not for the Deceptive Orders.

51.      Defendants' spoofing had several repeated, defining characteristics demonstrating that their only intent in placing the Deceptive Orders was to manipulate the market.

a.      The Deceptive Orders were often placed at the same price as the best-bid or offer price.  Because of the FIFO trade matching method, this consistent pattern ensured that the Deceptive Orders would strongly impact the market while still making it highly unlikely that those orders would be executed.

b.      The Deceptive Orders were typically cancelled within milliseconds of Defendants entering its Aggressor Orders, and often at the exact same time.

c.      The Aggressor Orders were often the exact size needed to take all available liquidity remaining after the cancelled Deceptive Orders.  This means that the trader making

the Aggressor Orders knew that the Deceptive Orders would be cancelled and knew the exact amount of liquidity that would remain thereafter. The repeated cancelling of the Deceptive Orders and the size of the Aggressor Orders, so as to sweep the entire remaining book at the artificially induced price, evidences that the same trader was behind both orders as part of a pre-planned Spoofing strategy.

52. Defendants' misconduct was recently uncovered in their 2019 Form 10-K, filed with the SEC on February 25, 2020:

> *Metals and U.S. Treasuries Investigations and Litigation and Related Inquiries.* Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries.[13]

53. Further, on March 17, 2020, the *Wall Street Journal* first reported that Defendants are being probed for market manipulation of Treasury securities.[14] Moreover, as the article noted, "[a]ccording to people familiar with the matter, the investigation also is probing the bank's trading in futures."[15] DOJ prosecutors within the Criminal Division's fraud section and officials at the CFTC are reportedly investigating.[16]

**C. Defendants Manipulated and Spoofed Other Commodity and Commodity Futures Markets**

54. Over the last decade, J.P. Morgan has repeatedly engaged in trading practices that attracted regulatory scrutiny. For example, in 2013, J.P. Morgan agreed to pay U.S. federal energy

---

[13] JPMorgan Chase & Co., 2019 Form 10-K, 286-87 (Feb. 25, 2020) *available at*: https://jpmorganchaseco.gcs-web.com/static-files/e9fce7aa-15b7-439d-8ea3-a5a30c8e2dfe (last accessed April 29, 2020).

[14] Dave Michaels, "Government is Broadening Investigations of Spoofing-Like Practices," *Wall Street Journal*, (Mar. 17, 2020) *available at*: https://www.wsj.com/articles/government-is-broadening-investigations-of-spoofing-like-practices-11584446400 (last accessed April 29, 2020).

[15] *Id.*

[16] Global Investigations Review, "DOJ Expands JPMorgan Spoofing Probe," (Mar. 17, 2020) *available at*: https://globalinvestigationsreview.com/short-cut/2020/march/17 (last accessed April 29, 2020).

regulators $410 million in connection with "power" market manipulation claims.[17]  J.P. Morgan previously agreed to pay a criminal fine of $550 million in connection with a Plea Agreement in May 2015 related to market-rigging of the FX spot market.[18]

55.     More recently, federal regulators have sought fines and criminal sanctions against Defendants and their employees for spoofing and other manipulation of the futures markets.  To wit, *Bloomberg* encapsulated the government's allegations with the headline, "JPMorgan's Metals Desk Was a Criminal Enterprise, U.S. Says."[19]  The regulatory findings and disciplinary proceedings against Defendants demonstrate that they developed a practice of manipulating the market through spoofing to increase their profitability at the expense of other investors.

56.     In addition, the DOJ and CFTC have already charged several of Defendants' employees with manipulating the precious metal futures market including Michael Nowak, Gregg Smith, and Christopher Jordan, who have been charged under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Their campaign of manipulation and spoofing – placing orders and then canceling them to trick other market participants – spanned nearly a decade.  According to the Department of Justice, more than a dozen individuals participated in the manipulation.[20]  So far, two have pled guilty to commodities fraud and a spoofing conspiracy for their participation in fraudulent

---

[17] *See* Scott DiSavino, "JPMorgan to pay $410 million to settle power market case," *Reuters* (July 30, 2013), *available at:* https://www.reuters.com/article/us-jpmorgan-ferc/jpmorgan-to-pay-410-million-to-settle-power-market-case-idUSBRE96T0NA20130730 (last accessed April 29, 2020).

[18] *See U.S. v. JP Morgan Chase & Co.* (D. Conn. 2015), Plea Agreement, dated May 19, 2015, *available at*: https://www.justice.gov/file/440491/download (last accessed April 29, 2020).

[19] *See, e.g.,* Tom Schoenberg and David Voreacos, "JPMorgan's Metals Desk was a Criminal Enterprise, U.S. Says," *Bloomberg* (Sept. 16, 2019), *available at*: https://www.bloomberg.com/news/articles/2019-09-16/jpmorgan-s-metals-desk-was-a-criminal-enterprise-u-s-says (last accessed April 29, 2020).

[20] *See* n.12, *supra*.

and deceptive trading activity in the precious metal futures markets.[21]  Some have also settled related civil claims with the CFTC.

57.     One of those pleading guilty was Christian Trunz, a former metals trader.  On August 29, 2019, Trunz pled guilty to "one count of conspiracy to engage in spoofing and one count of spoofing."  In the plea allocution, Trunz admitted that between July 2007 and August 2016 he placed thousands of orders that he did not intend to execute for gold, silver, platinum, and palladium futures contracts traded on CME Group-operated exchanges.  "Trunz learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors and is cooperating with authorities."[22]

58.     John Edmonds, another trader, also pled guilty in the spoofing conspiracy.   On November 6, 2018, in announcing the guilty plea, the DOJ stated that:

> For years, John Edmonds engaged in a sophisticated scheme to manipulate the market for precious metals futures contracts for his own gain *by placing orders that were never intended to be executed*. . . . The Criminal Division is committed to prosecuting those who undermine the investing public's trust in the integrity of our commodities markets through spoofing or any other illegal conduct. . . . In pleading guilty, Edmonds admitted that he learned this deceptive trading strategy from more senior traders at the Bank, and he personally deployed this strategy hundreds of times with the knowledge and consent of his immediate supervisors.  This case is the result of an ongoing investigation by the FBI's New York Field Office.[23]

(emphasis added).

---

[21] Press Release, DOJ, "Former Precious Metals Trader Pleads Guilty to Commodities Fraud and Spoofing Conspiracy" (Nov. 6, 2018) *available at*: https://www.justice.gov/opa/pr/former-precious-metals-trader-pleads-guilty-commodities-fraud-and-spoofing-conspiracy (last accessed April 29, 2020); and *see* n. 3, *supra*.

[22] Press Release, DOJ, "Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges," (Aug. 20, 2019) *available at*: https://www.justice.gov/opa/pr/precious-metals-trader-pleads-guilty-conspiracy-and-spoofing-charges (last accessed Apr. 29, 2020).

[23] *Id.*

59.     That Edmonds' and Trunz's "immediate supervisors" taught traders at J.P. Morgan how to spoof and were involved in the market rigging indicates that the practices were pervasive among Defendants' employees.  In fact, federal prosecutors have said that more than a dozen of Defendants' employees ultimately helped make manipulative spoof trades.[24]  Prosecutors also noted that J.P. Morgan employed an advanced method of spoofing – namely, J.P. Morgan traders layered multiple Deceptive Orders at different prices in rapid succession that, in the aggregate if not individually, were substantially larger than the visible portion of the opposite-side Genuine Order.  This new style of "layering" was more difficult both to execute and to detect.[25]

60.     Others have since been caught in the regulators' net.  On November 15, 2019, the DOJ charged four of Defendants' senior employees, including those supervising Trunz and Edmonds and other traders on the precious metals desk:  Jeffrey Ruffo (executive director who specialized in hedge fund sales); Gregg Smith (managing director of the trading desk); Michael Nowak (managing director and head of the precious metals desk); and Christopher Jordan (executive director and metals trader).  The charges against them include:  one count of conspiracy to conduct the affairs of an enterprise involved in interstate or foreign commerce through a pattern of racketeering activity (i.e., a "RICO" conspiracy); one count of conspiracy to commit wire fraud affecting a financial institution; bank fraud; commodities fraud; price manipulation; and spoofing.

61.     Specifically, the 14-count indictment alleges, *inter alia*, that:

The Defendants and their co-conspirators placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution, including in an attempt to artificially affect prices and to profit by deceiving other market participants.  More specifically:

---

[24] *See* n.12, *supra*.

[25] Superseding Indictment, *United States v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. No. 14, 2019), ECF No. 52 at ¶ 26e.

a.  In thousands of trading sequences, the Defendants and their coconspirators placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine Orders"). Sometimes, but not always, the Genuine Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time.

b.  During the same trading sequences, the Defendants and their coconspirators also placed one or more orders that they intended to cancel before execution ("Deceptive Orders") on the opposite side of the market from the Genuine Orders. The Deceptive Orders were not iceberg orders, and so the full order size was visible to other market participants.

62.  Further, the indictment alleged that through placing Deceptive Orders, Defendants' employees sought to inject false and misleading information about the actual supply and demand for precious metals futures contracts, and to deceive other market participants into believing that the visible order book accurately reflected market-based forces of supply and demand. As a result, "[t]his false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded."[26]

## CLASS ACTION ALLEGATIONS

63.  Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. The "Class" is defined as:

All persons or entities who transacted in Treasury Futures or options on Treasury Futures traded on a domestic exchange during the period January 1, 2009 through the present (the "Class Period").

---

[26] Press Release, DOJ, "Superseding Indictment Charges Former Precious Metals Salesman with Racketeering Conspiracy," (Nov. 15, 2019) *available at*: https://www.justice.gov/opa/pr/superseding-indictment-charges-former-precious-metals-salesman-racketeering-conspiracy (last accessed Apr. 29, 2020).

64. Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf. Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

65. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury Futures and options on Treasury Futures during the Class Period at prices artificially impacted by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiffs, this can be ascertained from readily available information.

66. Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein. No conflict between Plaintiffs and the Class members exists.

67. Plaintiffs will fairly and adequately protect the Class's interests. Plaintiffs are represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA. Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

68. The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available

methods for the fair and efficient adjudication of the controversy. Questions of law and fact common to all Class members, include, but are not limited to:

    a.    whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury Futures prices;

    b.    the nature and duration of Defendants' manipulation of Treasury Futures prices;

    c.    whether manipulation of Treasury Securities prices injected artificial prices into Treasury Futures that traded on the CME;

    d.    whether Defendants participated in the Treasury Futures market;

    e.    whether Defendants' conduct violated Section 22 of the CEA;

    f.    whether Defendants' conduct acted to aid and abet CEA violations;

    g.    whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

    h.    whether Defendants fraudulently concealed their misconduct from Plaintiffs and the Class; and

    i.    the appropriate class-wide measure of relief for the Defendants' CEA violations.

69. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

70.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

71.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

72.     During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of the Treasury Futures market.

73.     Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Treasury Futures at a certain price, even though they secretly had no intent of transacting at that level. Never did Defendants disclose that they placed these orders to manipulate the prices of those instruments. Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiffs and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

74.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before February 25, 2020, when Defendants announced in their 2019 Form 10-K filing with the SEC that they had received a request from regulators regarding their practices in the Treasury Futures market.

75.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs and the Class.

76.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## FIRST CLAIM FOR RELIEF
### Manipulation of Treasury Futures
### in Violation of the Commodity Exchange Act
### (7 U.S.C. § 1, *et seq.* and Regulation 180.2)
### (Against All Defendants)

77.     Plaintiffs incorporate the Complaint's allegations by reference and realleges them as though fully set forth herein.

78.     During the Class Period Defendants intended to and did cause unlawful and artificial prices of Treasury Futures in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

79.     Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

80.     During the Class Period, Treasury Futures' prices did not result from the legitimate market information and the forces of supply and demand.  Instead, Treasury Futures' prices were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

81.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in Treasury Futures.

82.     Defendants manipulated Treasury Futures' prices throughout the Class Period, and thereby caused damages to Plaintiffs and Class members who purchased or sold at these artificially inflated or deflated prices.

83.     Defendants had the ability to cause and did cause artificial prices of Treasury Futures. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Treasury Futures and were aware of the effects of spoofing on those markets.

84.     Defendants' ability to cause artificial prices was enhanced through their use of algorithmic and HFT technology, which allowed them to place and cancel large spoof orders while avoiding having those orders filled.

85.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

86.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures, to which Plaintiffs and the Class would not have been subject but for Defendants' unlawful conduct.

87.     Plaintiffs and the Class are each entitled to actual damages sustained in Treasury Futures for the CEA violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**For Employing a Manipulative and Deceptive Device In**
**Violation of the Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))**
**(Against All Defendants)**

88.     Plaintiffs incorporate the Complaint's allegations by reference and realleges them as though fully set forth herein.

89.     Defendants' unlawful conduct, including the use of submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures, constitutes the employment of a manipulative and deceptive device.

90.     Defendants acted intentionally – and, even if they are found to not have acted intentionally, then at least acted recklessly – in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiffs and the Class.  The risk that the

Defendants' spoof orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by the Defendants' spoof orders was so obvious that the Defendants must have been aware of it.

91.     Defendants knew that their spoof orders would appear in the Order Book and that traders often consider Order Book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their spoof orders would mislead other market participants.

92.     Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

93.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures contracts and options on those futures contracts, to which Plaintiffs and the Class would not have been subject but for Defendants' unlawful conduct.

94.     Plaintiffs and the Class are each entitled to damages for the CEA violations alleged herein.

### THIRD CLAIM FOR RELIEF
#### Vicarious Liability in Violation of the
#### Commodity Exchange Act, As Amended
#### (7 U.S.C. §§ 1, *et seq.*)
#### (Against All Defendants)

95.     Plaintiffs incorporate the Complaint's allegations by reference and realleges them as though fully set forth herein.

96.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

97.     Plaintiffs and the Class are each entitled to damages for the CEA violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants)**

98.     Plaintiffs incorporate the Complaint's allegations by reference and reallege them as though fully set forth herein.

99.     Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted spoof orders to the CME and employed other techniques to manipulate the prices of Treasury Futures in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiffs' and the Class' expense.

100.    It would be inequitable for Defendants to be allowed to retain the benefits, which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiffs' and the Class' expense.

101.    Plaintiffs and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

102.    In addition, each Defendant should pay restitution of its own unjust enrichment to Plaintiffs and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and their counsel as Class Counsel;

(B)     For a judgment awarding Plaintiffs and the Class actual damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

31

(D)     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues.

Dated: May 1, 2020

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**

 /s/ *Anthony F. Fata*
Anthony F. Fata
Jennifer W. Sprengel
Christopher P.T. Tourek
Brian P. O'Connell
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.: 312-782-4882
Email: afata@caffertyclobes.com
jsprengel@caffertyclobes.com
ctourek@caffertyclobes.com
boconnell@caffertyclobes.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

**KIRBY McINERNEY, LLP**
David E. Kovel
Karen M. Lerner
Anthony E. Maneiro
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: (212) 371-6600
Email: dkovel@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

**LOWEY DANNENBERG, P.C.**
Vincent Briganti
Raymond P. Girnys
Johnathan P. Seredynski
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Email: vbriganti@lowey.com
rgirnys@lowey.com
jseredynski@lowey.com

*Counsel for Plaintiffs and the Proposed Class*